UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                        CRIMINAL ACTION NO. 3:08CR-119-S

THOMAS SCHROEDER                                              DEFENDANT

## COURT'S INSTRUCTIONS TO THE JURY

Members of the Jury:

It is now my duty to instruct you on the rules of law that you must follow and apply in deciding this case. When I have finished you will go to the jury room and begin your deliberations.

It will be your duty to decide whether the United States has proved beyond a reasonable doubt the specific facts necessary to find the defendant guilty of the crimes charged in the superseding indictment.

You must make your decision only on the basis of the testimony and other evidence presented here during the trial; and you must not be influenced in any way by either sympathy or prejudice for or against the defendant or the United States.

You must also follow the law as I explain it to you whether you agree with that law or not; and you must follow all of my instructions as a whole. You may not single out, or disregard, any of the court's instructions on the law.

The indictment or formal charge against any defendant is not evidence of guilt. The defendant is presumed by the law to be innocent. The law does not require a defendant to prove innocence or produce any evidence at all. The United States has the burden of proving a defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the defendant not guilty.

While the United States' burden of proof is a strict or heavy burden, it is not necessary that a defendant's guilt be proved beyond all possible doubt. It is only required that the United States' proof exclude any "reasonable doubt" concerning a defendant's guilt.

A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.

You must consider only the evidence that I have admitted in the case. The term "evidence" includes the testimony of the witnesses and the exhibits admitted in the record. Remember that anything the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you.

In considering the evidence you may make deductions and reach conclusions which reason and common sense lead you to make. You need not be concerned about whether the evidence is direct or circumstantial. "Direct evidence" is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. "Circumstantial evidence" is proof of a chain of facts and circumstances indicating that the defendant is either guilty or not guilty. The law makes no distinction between the weight you may give to either direct or circumstantial evidence.

Now, in saying that you must consider the evidence, I do not mean that you must accept all of the evidence as true or accurate.  You should decide whether you believe what each witness had to say, and how important that testimony was.  In making that decision you may believe or disbelieve any witness, in whole or in part.  Also, the number of witnesses testifying concerning any particular dispute is not controlling.

In deciding how much of a witness' testimony to believe, I suggest that you ask yourself a few questions:  Did the witness impress you as one who was telling the truth?  Did the witness have any particular reason not to tell the truth or a personal interest in the outcome of the case?  Did the witness have a good memory?  Did the witness have the opportunity and ability to observe accurately the things he or she testified about?

You should also ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact; or, whether there was evidence that at some other time the witness said or did something, or failed to say or do something, which was different from the testimony given before you during the trial.

However, a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people naturally tend to forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that was simply an innocent lapse of memory or an intentional falsehood.

As stated before, a defendant has a right not to testify. If a defendant does testify, however, you should decide in the same way as that of any other witness whether you believe his testimony.

Certain exhibits variously referred to as schedules or summaries have been admitted into evidence. Strictly speaking, these exhibits are not actual evidence, but are admitted as summaries of evidence for your convenience and assistance. These summaries have no independent value, and you should consider them only insofar as you have concluded that they accurately reflect the documents and testimony admitted into evidence. If you find that the summaries do not accurately reflect the evidence in this case, you should disregard them entirely.

## COUNT 1

Count 1 of the superseding indictment charges the defendant with mail fraud.

Title 18, United States Code, Section 1341 makes it a federal crime for anyone to use the United States Postal Service in carrying out a scheme to defraud.

The defendant can be found guilty of mail fraud only if all of the following facts are proved beyond a reasonable doubt:

First:  That from July 2001 to and including July 2008, Thomas Schroeder knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property;

Second:  That the scheme included a material misrepresentation or concealment of a material fact;

Third:  That the defendant had the intent to defraud; and

Fourth:  That the defendant used the United States Postal Service or caused another to use the United States Postal Service in furtherance of the scheme.

The phrase "scheme to defraud" includes any plan or course of action intended to deceive others, and to obtain, by false or fraudulent pretenses, representations, or promises, money or property from the person so deceived.

A statement, representation, or promise is "false" if it relates to a material fact, is known to be untrue or is made with reckless indifference as to its truth or falsity, and is made or caused to be made with intent to defraud. A statement or representation is also "false" if it constitutes a half-truth, or if it effectively conceals a material fact, and is made with intent to defraud.

A "material fact" is a fact that would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction.

To act with "intent to defraud" means to act knowingly and with the specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

To "cause" the mails to be used is to do an act with knowledge that the use of the mails will follow in the ordinary course of business or where such use can reasonably be foreseen.

It is not necessary that the United States prove all of the details alleged in the superseding indictment concerning the precise nature and purpose of the scheme; or that the material mailed was itself false or fraudulent; or that the alleged scheme actually succeeded in defrauding anyone; or that the use of the mails was intended as the specific or exclusive means of accomplishing the alleged fraud.

What must be proved beyond a reasonable doubt is that the defendant knowingly and with intent to defraud participated in, devised or intended to devise a scheme to defraud substantially the same as the one alleged in the superseding indictment; and that the use of the United States Postal Service was closely related to the scheme because the defendant either mailed something or caused it to be mailed in an attempt to execute or carry out the scheme.

The superseding indictment alleges that the defendant caused three separate uses of the mails in furtherance of a scheme to defraud. Although you must unanimously agree as to which mailing or mailings the defendant caused in order to find him guilty, the United States is not required to prove that he caused every mailing charged in the superseding indictment: one such mailing is enough.

## COUNT 2

Count 2 of the superseding indictment charges the defendant with conspiracy either to launder money or to engage in a monetary transaction in criminally derived property, or both, in violation of Title 18, United States Code, Section 1956(h). It is a crime for two or more people to agree with each other to commit either of those criminal acts, even if they never actually achieve their goal.

A conspiracy is a kind of criminal partnership. The defendant can be found guilty of conspiracy in violation of Section 1956(h) only if all of the following facts are proved beyond a reasonable doubt:

First: That from July 2001 to and including June 2008, Thomas Schroeder and Robert Felner agreed to commit the crime of laundering of a monetary instrument or the crime of engaging in a monetary transaction in property derived from mail fraud, or both; and

Second: That Thomas Schroeder knowingly and voluntarily joined in that agreement.

Although you must unanimously agree as to which crime or crimes the defendant conspired to commit in order to find him guilty, the United States is not required to prove that he conspired to commit both of these acts: proof that the defendant agreed to commit one of them is enough.

The next two instructions explain the elements of the crimes the defendant is charged with conspiring to commit. Because he is charged with conspiracy and not with actually doing the illegal acts, the elements of the two underlying crimes need not be proven for you to return a guilty verdict. The offense definitions are offered solely for your reference as you decide whether or not Thomas Schroeder agreed with Robert Felner to commit one or both of these crimes.

## ***Definition of Money Laundering***

One of the objects of the conspiracy charged in Count 2 is the crime of money laundering.

While the United States need not prove that the defendant actually committed money laundering (it need only prove the elements of conspiracy set out above), the elements are as follows:

First: That the defendant conducted or attempted to conduct a financial transaction;

Second: That the financial transaction involved property that represented the proceeds of mail fraud;

Third: That the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

Fourth: That the defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of mail fraud.

The term "financial transaction" means a transaction involving the use of an insured bank or any credit union which is engaged in, or the activity of which affects, interstate or foreign commerce in any way or degree.

To "conduct" a transaction means to initiate, conclude, or participate in initiating or concluding such transaction.

The "proceeds" of unlawful activity are any property produced by or derived from some form of unlawful activity, including the gross receipts of such activity.

The phrase "knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity" means that the defendant knew that the funds involved in the transaction represented the proceeds of some form, though not necessarily which form, of activity that constitutes a felony under state or federal law.

### *Definition of Unlawful Monetary Transaction*

The other object of the conspiracy charged in Count 2 is engaging in an unlawful monetary transaction in property derived from mail fraud. While the United States need not prove that the defendant actually engaged in an unlawful monetary transaction (again, it need only prove the elements of conspiracy), the elements are as follows:

First: That the defendant knowingly engaged in or attempted to engage in a monetary transaction;

Second: That the monetary transaction was in property derived from mail fraud;

Third: That the property had a value greater than $10,000.00;

Fourth: That the defendant knew that the transaction was in criminally derived property; and

Fifth: That the monetary transaction took place within the United States.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to an insured bank or any credit union.

The term "monetary instrument" includes coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, money orders, investment securities, and negotiable instruments.

To summarize:  In deciding whether the defendant is guilty of conspiracy under Section 1956(h), as charged in Count 2, you will consider the definitions of the crimes he is alleged to have conspired to commit.  The United States, however, need not prove that one or both of those two crimes were actually committed:  it need only prove that the defendant knowingly and voluntarily agreed with another person to commit one or both of them.

## COUNT 3

Count 3 of the superseding indictment charges the defendant with conspiracy to defraud the Internal Revenue Service.

Title 18, United States Code, Section 371 makes it a federal crime to conspire to defraud the United States or any agency thereof. It is a crime for two or more persons to agree to defraud the United States, even if they never actually achieve their goal.

For you to find the defendant guilty of conspiracy to defraud the Internal Revenue Service, the United States must prove each of the following elements beyond a reasonable doubt:

First: That from July 2001 to and including July 2008, Thomas Schroeder and Robert Felner agreed to defraud the Internal Revenue Service by dishonest means;

Second: That Thomas Schroeder knowingly and voluntarily joined in that agreement; and

Third: That a member of the conspiracy did one of the overt acts described in the superseding indictment for the purpose of advancing or helping the conspiracy.

For purposes of Count 3, the word "defraud" is not limited to its ordinary meaning of cheating the victim (here, the Internal Revenue Service) out of money or property. In this context, "defraud" also includes impairing, obstructing, or defeating the lawful function of a government agency or department by dishonest means.

The term "overt act" means some type of outward objective action performed by one of the members of the conspiracy which evidences the existence of the conspiracy. The overt act must have occurred while the conspiracy was in existence. The overt act may, but for the alleged unlawful conspiracy, appear totally innocent and legal.

Although you must unanimously agree as to which overt act was committed in order to find the defendant guilty, the United States is not required to prove the commission of every overt act charged:  one such act is enough.

Counts 2 and 3 of the superseding indictment charge the defendant with being a member of a criminal conspiracy. A conspiracy is an agreement to violate the law, and like any other agreement it need not be formal, written, or even expressed directly in every detail.

Merely associating with others and discussing common goals, or merely being present at the place where unlawful activity is discussed, or even knowing about criminal conduct does not, by itself, make someone a member of a conspiracy. Actual knowing and voluntary agreement to join the scheme is required.

If the evidence establishes the existence of all the elements of a conspiracy, the fact that the defendant did not join the conspiracy at the beginning, or did not know all the details of the agreement, or did not play a major role in accomplishing the unlawful goal is not important to your decision regarding whether the defendant is guilty of either charge of conspiracy.

Because of a difference in the language of the statutes under which the defendant is charged, proof beyond a reasonable doubt of the conspiracy alleged in Count 3 requires proof of an overt act, whereas proof of the conspiracy charged in Count 2 does not.

The United States does not have to prove with certainty the exact date or dates of each alleged crime. It is sufficient if the United States proves beyond a reasonable doubt that each crime was committed on a date or dates reasonably near the date or dates alleged.

The word "knowingly," as that term has been used in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

A separate crime is charged in each count of the superseding indictment. Each charge and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty as to one of the crimes charged should not affect your verdict as to any other crime charged.

There is no requirement that all members of a conspiracy or criminal enterprise be charged and prosecuted, or that they be tried together in one proceeding. Conversely, the outcome of any proceeding that may have taken place involving other people involved in the charged criminal activities is not evidence in this case.

The defendant is on trial only for those specific crimes alleged in the superseding indictment. Also, the question of punishment should never be considered by the jury in any way in deciding the case. If the defendant is convicted the matter of punishment is for the judge to determine.

Any verdict you reach in the jury room, whether guilty or not guilty, must be unanimous. In other words, to return a verdict you must all agree. Your deliberations will be secret; you will not have to explain your verdict to anyone.

It is your duty as jurors to discuss the case with one another in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after full consideration of the evidence with the other members of the jury. While you are discussing the case do not hesitate to re-examine your own opinion and change your mind if you become convinced that you were wrong. But do not give up your honest beliefs solely because the others think differently or merely to get the case over with.

When you go to the jury room you should first select one of your members to act as your foreperson. The foreperson will preside over your deliberations and will speak for you here in court.

A form of verdicts has been prepared for your convenience.

You will take the verdict form to the jury room and when you have reached unanimous agreement you will have your foreperson fill in the verdict form, date and sign it, and then return to the courtroom.

During your deliberations, you must not discuss this case with anyone outside the jury, or provide anyone outside the jury with any information about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, BlackBerry, or computer; the Internet, any Internet service, or any text or instant messaging service; or any Internet chat room, blog, or website such as Facebook, MySpace, LinkedIn, YouTube, or Twitter, to communicate to anyone information about this case or to conduct any research about this case until I have accepted your verdicts.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA

<u>SUPERSEDING INDICTMENT</u>

v.

NO. <u>3:08CR-119-S</u>
18 U.S.C. § 371
18 U.S.C. § 981
18 U.S.C. § 982
18 U.S.C. § 1341
18 U.S.C. § 1956(a)(1)(B)(ii)
18 U.S.C. § 1956(h)
28 U.S.C. § 2461

**THOMAS SCHROEDER**

The Grand Jury charges:

<u>COUNT 1</u>
(Mail Fraud)

1.      From in or about July 2001, and continuing to in or about July 2008, the

defendant, **THOMAS SCHROEDER** and Robert Felner, aided and abetted one another, devised

and intended to devise a scheme and artifice to defraud the University of Rhode Island (URI), the

University of Louisville (UofL), and the Rock Island County Council on Addiction (RICCA) out

of money and property by means of false and fraudulent pretenses and representations, knowing

that the pretenses and representations were false and fraudulent when made.  The scheme and

artifice to defraud is set forth in the paragraphs 2 through 33.

University of Rhode Island - NCPE

2.     From 1996 through 2003, Robert Felner served as the Director of the School of

Education and as a Professor at the University of Rhode Island.

3.     In 1997, while at the University of Rhode Island, Robert Felner established the

National Center on Public Education and Social Policy (NCPE) at the University of Rhode

Island.  He served as the director of NCPE from 1997 through 2006.  NCPE, while a division of

URI, was a self-funded organization that generated income by contracting with school districts

around the country to provide assessments of school districts.  The income NCPE generated from

these assessments was used to pay its staff, employees, and all other costs associated with the

assessments.

4.     NCPE assessed school districts by providing surveys to individual school districts

for students, parents, administrators, and teachers to complete.  NCPE then analyzed the

completed surveys and provided reports and recommendations to the school districts.  On

average, the cost to NCPE was $4,500 per school in each district.  The revenue generated from

the surveys and assessments was NCPE's primary source of funding.

5.     The primary school district contracting with NCPE was the Rhode Island

Department of Education ("RIDE").  NCPE maintained a contract with RIDE from 1997 to July

2008.  The RIDE contract paid NCPE approximately $800,000 per year to conduct the surveys

and provide assessments.  NCPE also contracted with a number of other school districts outside

the state of Rhode Island to conduct surveys and provide assessments.

<u>National Center on Public Education and Prevention-NCPEp</u>

6.    On June 5, 2001, **THOMAS SCHROEDER** submitted an application on behalf of the National Center on Public Education and Prevention ("NCPEp") for an employer identification number ("EIN").

7.    On October 17, 2001, NCPEp was incorporated in the State of Illinois. **THOMAS SCHROEDER** signed as the incorporator of this "General-Not-For-Profit" corporation.

8.    In or about May 2001, **THOMAS SCHROEDER** created an Executive Consulting Agreement with NCPEp to pay himself $3,000 a month, initially covering the period May 1, 2001, through April 30, 2002.

9.    On July 17, 2001, NCPEp opened a bank account at American Bank & Trust ("NCPEp-AB&T") in Rock Island, Illinois. **THOMAS SCHROEDER** and T.F. were the original signatories on the account. American Bank & Trust is a financial institution as defined by 18 U.S.C. § 20.

10.    On July 24, 2001, **THOMAS SCHROEDER**, as executive director of NCPEp, signed a Royalty Agreement with Robert Felner for $97,000.

11.    On November 14, 2001, an Application for Certificate of Authority for Foreign Corporation was filed with the Georgia Secretary of State. A certificate to transact business in Georgia was issued to NCPEp effective November 20, 2001.

12.    On June 11, 2002, a Statement and Designation By Foreign Corporation for NCPEp was filed with the California Secretary of State. A Certificate Of Status Foreign Corporation was issued on June 13, 2002.

3

13. On June 28, 2002, **THOMAS SCHROEDER** signed a new account form and opened a new account for NCPEp at Citizens Bank ("NCPEp-Citizens") in Rhode Island. On the next day, Robert Felner signed the new account form. Included in the new account form was a notarized NCPEp resolution showing Robert Felner as the Board Chair of NCPEp. The resolution was signed by **THOMAS SCHROEDER.** Citizens Bank is a financial institution as defined by 18 U.S.C. § 20.

14. On September 12, 2002, **THOMAS SCHROEDER**, as president, and R.S., as secretary, amended the articles of incorporation of NCPEp. The amendment stated in part "No part of the earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered ... upon dissolution of the corporation, assets shall be distributed to one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code,..."

15. On February 12, 2004, Robert Felner opened a business bank account in the name of NCPEp at Branch Banking and Trust ("NCPEp-BB&T Business") in Louisville, Kentucky. Robert Felner was listed as the sole signatory on the account. The account application stated NCPEp was established on June 1, 1995, and that Felner was a "certifying officer" of the corporation. Branch Banking and Trust is a financial institution as defined by 18 U.S.C. § 20.

16. On or about November 22, 2004, Robert Felner opened an investment account at Branch Banking and Trust in the name of NCPEp ("NCPEp-BB&T Investment"). Robert Felner opened the account as the executive director and as an officer of NCPEp. This account was

linked to NCPEp-BB&T Business account and was used solely as a personal investment account by Robert Felner.

17. On March 1, 2006, the State of Illinois involuntarily dissolved NCPEp for failure to file annual reports.

18. From 2001 through 2008, Robert Felner and **THOMAS SCHROEDER** fraudulently used NCPEp to obtain by fraudulent and false pretenses approximately $1,706,972.28 from NCPE and $450,000 from UofL. In addition Robert Felner fraudulently caused UofL to send approximately $126,000 to NCPE for work unrelated to UofL. In May of 2008 Robert Felner and **THOMAS SCHROEDER** attempted to obtain, by fraudulent and false pretenses, an additional $180,000 from UofL through the use of NCPEp. Also in May of 2008 Robert Felner fraudulently attempted to cause UofL to send an additional $60,000 to NCPE.

Atlanta Contracts

19. The Atlanta Board of Education ("Atlanta schools") contracted with Robert Felner, on behalf of NCPE, to perform surveys and assessments of its schools from 2001 through 2004. NCPE performed the contracted work. NCPE, however, received no payment from the Atlanta schools because Robert Felner and **THOMAS SCHROEDER** fraudulently concealed approximately $1,005,972 in payments made by the school district. Robert Felner fraudulently induced the Atlanta schools to make payments to NCPEp, instead of NCPE, so that he could use the money for his and **THOMAS SCHROEDER'S** personal benefit. The fraudulently obtained payments were deposited into the NCPEp-AB&T and NCPEp-BB&T Business accounts

5

controlled by Robert Felner and **THOMAS SCHROEDER**. The following payments were fraudulently concealed from NCPE:

    A.    $404,000 on 7/17/2001;
    B.    $275,305.80 on 3/8/2002;
    C.    $137,666.68 on 7/2/2002; and
    D.    $189,000 on 8/31/2004.

Buffalo/New York Middle School Association Contracts

20.    The Buffalo, New York, and New York Middle School Association (Buffalo schools) contracted with Robert Felner, on behalf of NCPE, to perform survey and assessments of Buffalo schools from 2002 through 2007. NCPE performed the contracted work. NCPE, however, received no payment from the Buffalo schools because Robert Felner and **THOMAS SCHROEDER** fraudulently concealed approximately $326,000 in payments made by the school district. Robert Felner fraudulently induced the Buffalo schools to make payments to NCPEp, instead of NCPE, so that he could use the money for his and **THOMAS SCHROEDER'S** personal benefit. The fraudulently obtained payments were deposited into the NCPEp-AB&T, NCPEp-Citizens, and NCPEp-BB&T Business accounts controlled by Robert Felner and **THOMAS SCHROEDER**. The following payments were fraudulently concealed from NCPE:

    A.    $18,000 on 7/2/2002;
    B.    $44,000 on 6/24/2003;
    C.    $49,500 on 6/18/2004;
    D.    $33,000 on 2/14/2005;
    E.    $22,000 on 3/2/2005;
    F.    $27,500 on 4/22/2005;
    G.    $24,750 on 6/2/2006;
    H.    $16,500 on 6/12/2006;
    I.    $24,750 on 6/22/2006;
    J.    $44,000 on 8/9/2007; and

K.    $22,000 on 9/24/2007.

Santa Monica Contracts

21.    The Santa Monica/Malibu Unified School District ("Santa Monica Schools")
contracted with Robert Felner, on behalf of NCPE, to perform surveys and assessments of its
schools from 2002 through 2004.  NCPE performed the contracted work.  NCPE, however,
received no payment from the Santa Monica schools because Robert Felner and **THOMAS
SCHROEDER** fraudulently concealed approximately $375,000 in payments made by the school
district.  Robert Felner fraudulently induced the Santa Monica schools to make payments to
NCPEp, instead of NCPE, so that he could use the money for his and **THOMAS
SCHROEDER'S** personal benefit.  The fraudulently obtained payments were deposited into
NCPEp-AB&T and NCPEp-BB&T Business accounts controlled by Robert Felner and
**THOMAS SCHROEDER**.  The following payments were fraudulently concealed from NCPE:

A.    $125,000 on 9/19/2002;
B.    $125,000 on 3/25/2003; and
C.    $125,000 on 12/20/2004.

University of Louisville

22.    In 2003 Robert Felner was appointed the Dean of the College of Education and
Human Development at the University of Louisville (UofL).

23.    On September 1, 2005, UofL received a federal earmark grant related to the No
Child Left Behind Act ("NCLB Grant") for $694,000 that was appropriated by the United States
Congress and was administered by the United States Department of Education.  The Principal
Investigator of the grant was Robert Felner.  As the Principal Investigator, Felner was the lead
UofL faculty member for the grant and directly responsible for the completion of the funded

7

projected. The stated goal of the initial grant was to establish the Center for Research-Based Educational Improvement and Assessment: Support and Continual Improvement of No Child Left Behind in Kentucky at the UofL and to conduct research on Kentucky students that relate to the federal No Child Left Behind program.

24.     On January 5, 2007, Robert Felner fraudulently executed on behalf of the University of Louisville Research Foundation, Inc. a personal service contract with NCPEp to perform work related to the NCLB Grant. The contract contained the signatures of **THOMAS SCHROEDER** for NCPEp and Robert Felner as the recommending department head. The contract was for a sum not to exceed $250,000.

(A)     On March 15, 2007, NCPEp invoiced UofL for the first installment on the contract for $150,000. The invoice fraudulently stated NCPEp completed work on the grant. UofL paid this invoice and the check was deposited in the NCPEp-BB&T Business account.

(B)     On March 15, 2007, NCPEp invoiced UofL for the second installment on the contract for $50,000. The invoice fraudulently stated NCPEp completed work on the grant. UofL paid this invoice and the check was deposited in the NCPEp-BB&T Business account.

(C)     On June 29, 2007, NCPEp invoiced UofL for the third installment on the contract for $50,000. The invoice fraudulently stated NCPEp completed work on the grant. UofL paid this invoice and the check was deposited in the NCPEp-BB&T Business account.

25.     On December 3, 2007, Robert Felner fraudulently executed on behalf of the UofL Research Foundation, Inc. a subcontract with NCPEp to perform additional work related to the NCLB Grant. The contract contained the signature of **THOMAS SCHROEDER** as the Executive Director of NCPEp. The contract was for a sum not to exceed $200,000 for the period

of September 1, 2007 through August 31, 2008. On November 30, 2007, NCPEp fraudulently invoiced UofL for $200,000. UofL paid this invoice and the check was deposited in the NCPEp-BB&T Business account.

26.     On or about May 12, 2008, Robert Felner fraudulently executed on behalf of the UofL Research Foundation, Inc. a $120,000 extension of the personal services contract with NCPEp for data collection and surveys allegedly related to the NCLB Grant. On or about May 22, 2008, Robert Felner and **THOMAS SCHROEDER** caused an NCPEp invoice to be submitted to UofL for payment under this contract. At Robert Felner's request, the funding source for the contract was the UofL Offutt Endowment Account which is part of the UofL Foundation, Inc.. UofL made no payments on this contract.

27.     On May 30, 2008, Robert Felner fraudulently executed on behalf of the UofL Research Foundation, Inc. a $60,000 extension of the NCLB Grant personal service contract with NCPEp. Robert Felner, however, switched the actual funding source for this contract from the NCLB Grant to his UofL personal research fund account.

28.     From in or about 2005 through 2007, Robert Felner fraudulently executed on behalf of the UofL Research Foundation, Inc. multiple contracts and memorandums of agreement with NCPE for work purportedly related to UofL research. No work, however, related to UofL research was performed by NCPE. The payments, instead, were intended by Robert Felner to compensate NCPE for the work it completed for the Atlanta, Buffalo, and Santa Monica schools. Robert Felner fraudulently caused UofL to make the following payments to NCPE:

        A. On or about November 24, 2004, Robert Felner fraudulently caused NCPE to invoice UofL for the printing costs of the California and Buffalo schools' surveys. Robert

9

Felner represented to UofL that these costs were expenses associated with UofL. On February 24, 2005, UofL issued check #1522645 in the amount of $6,178 to NCPE in payment of this invoice.

B. On or about May 5, 2006, Robert Felner, on behalf of UofL, fraudulently executed a memorandum of agreement with NCPE for work purportedly related to the NCLB Grant. On June 13, 2006, UofL issued check #622581 in the amount of $30,000 to NCPE in payment for work Robert Felner fraudulently represented to UofL that NCPE completed.

C. On or about March 1, 2006, Robert Felner, on behalf of UofL, fraudulently executed a subcontract with NCPE for work purportedly related to UofL research. On October 20, 2006, UofL issued check #1638518 in the amount of $24,049.51 and on October 30, 2006, UofL issued check #1639434 in the amount of $35,950.49 in payment for work Robert Felner fraudulently represented that NCPE completed on that NCLB Grant.

D. On or about January 3, 2007, Robert Felner, on behalf of UofL, fraudulently executed a memorandum of agreement with NCPE purportedly related to UofL research. On March 21, 2007, UofL issued check #1654548 in the amount of $15,000 and on March 23, 2007, UofL issued check #1654836 in the amount of $15,000 in payment for work Robert Felner fraudulently represented to UofL that NCPE completed on the NCLB Grant.

E.     On or about May 21, 2008, Robert Felner, fraudulently executed on behalf of UofL, a $60,000 personal services contract with NCPE work purportedly related to UofL research.  UofL made no payments on this contract.

29.     NCPEp did not perform any work under the personal service contracts, subcontracts, or memoranda of agreement related to the NCLB Grant.  UofL made the payments to NCPEp based on misrepresentations by Robert Felner and **THOMAS SCHROEDER** that NCPEp in fact completed the work claimed under the individual contracts.  The payments made by UofL to NCPEp were used solely by Robert Felner and **THOMAS SCHROEDER** for their personal benefit.

Rock Island County Council on Addictions

30.     From in or about June 2004 through July 2008, **THOMAS SCHROEDER** fraudulently caused RICCA to make $88,750 in payments to Robert Felner and NCPEp for work allegedly performed by Robert Felner and NCPEp pursuant to a contract with RICCA.   No such work was performed and these funds were deposited into NCPEp accounts controlled by **THOMAS SCHROEDER** and Robert Felner and were later withdrawn by **THOMAS SCHROEDER**.

THE MAILINGS

31.     In or about August 2004, Robert Felner and **THOMAS SCHROEDER** caused the Atlanta Schools to mail check #443370 in the amount of $189,000 to NCPEp located at "National Center on Public Ed & Prev, c/o of Ed and Human Dev., Dean-Belknap Campus/Univ Lou, Louisville, KY 40292."

11

32.     In or about June 2004, Robert Felner and **THOMAS SCHROEDER** caused

Buffalo schools to mail check #217605 in the amount of $49,500 to NCPEp located at "National

Center on Public Education and Prevention Inc., Office of Dean College of Ed & Human Dev.

Univ. of Louisville, Louisville, KY 40292."

33.     On or about March 22, 2007, UofL sent via United Parcel Service check

#1654278 in the amount of $200,000 to NCPEp in Rock Island, Illinois.

All in violation of Title 18, United States Code, Section 1341.


The Grand Jury further charges:

## COUNT 2
### (Money Laundering Conspiracy)

34.     Grand Jury realleges and incorporates by reference the allegations set forth in

Count 1 as though fully set forth herein.

### THE CONSPIRACY

35.     Beginning in or about July 2001, and continuously thereafter until on or about

June 2008, in the Western District of Kentucky, Jefferson County, Kentucky, and elsewhere, the

defendant, **THOMAS SCHROEDER** and Robert Felner knowingly combined, conspired and

agreed together to commit certain offenses under 18 U.S.C. §§ 1956 and 1957, in that the

defendants agreed with each other to conduct financial transactions affecting interstate

commerce, which transactions involved the proceeds of specified unlawful activity, knowing that

the money involved in the transactions represented the proceeds of some form of unlawful

activity and also knowing that the transactions were designed, in part, to conceal and disguise the

source, location, ownership, nature and control of proceeds of the specified unlawful activity, and the defendant knowingly engaged in a monetary transaction in criminally derived property that was of a value greater than $10,000 and was derived from a specified unlawful activity.

## THE MANNER AND MEANS OF THE CONSPIRACY

36.     It was further a part of the conspiracy that, in furtherance of the conspiracy, Robert Felner and **THOMAS SCHROEDER,** devised or intended to devise a scheme and artifice to defraud and obtain money by false or fraudulent pretenses and for the purpose of executing such scheme and artifice and attempting to do so placed or caused to by placed any matter or thing to be sent or delivered by the Postal Service and private or commercial interstate carrier, in violation of 18 U.S.C. § 1341.

37.     It was further part of the conspiracy that from 2001 through 2008 Robert Felner and **THOMAS SCHROEDER** created and used NCPEp to fraudulently obtain funds from NCPE, a division of the University of Rhode Island, the University of Louisville, and the Rock Island County Counsel on Addiction.  NCPEp was created with similar in name to NCPE to enable Robert Felner and **THOMAS SCHROEDER** to appear as if they were operating as NCPE.  This caused other entities to believe and assume that they were actually dealing with NCPE.

38.     It was further part of the conspiracy that Robert Felner and **THOMAS SCHROEDER** opened and used bank accounts, including NCPEp-Citizens, NCPEp-AB&T, and NCPEp-BB&T Business, at three different financial institutions to divert, steal, and embezzle funds from NCPE and the University of Louisville.  American Bank & Trust, Citizens Bank, and Branch Banking and Trust are all financial institutions as defined by 18 U.S.C. § 20.

13

39. It was further part of the conspiracy that Robert Felner and **THOMAS SCHROEDER** caused the Atlanta, Santa Monica, and Buffalo schools to issue payments to NCPEp for work actually performed by NCPE.

40. It was further part of the conspiracy that Robert Felner and **THOMAS SCHROEDER** caused the University of Louisville to enter into contracts with and make payments to NCPEp so that they could fraudulently obtain funds from the University of Louisville.

41. It was further part of the conspiracy that **THOMAS SCHROEDER** and Robert Felner fraudulently caused RICCA to make payments to Robert Felner and NCPEp for work allegedly performed by Robert Felner and NCPEp pursuant to a contract with RICCA. No such work was performed and these funds were deposited into NCPEp accounts controlled by **THOMAS SCHROEDER** and Robert Felner and were later withdrawn by **THOMAS SCHROEDER**.

## OVERT ACTS

42. As a part of the conspiracy, and in furtherance thereof, the defendant, **THOMAS SCHROEDER** and Robert Felner committed and caused to be committed the following overt acts, among others:

A. On or about July 17, 2001, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $404,000 check from the Atlanta schools to be deposited into the NCPEp-AB&T account.

14

B.    On or about March 8, 2002, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $275,305 check from the Atlanta schools to be deposited into the NCPEp-AB&T account.

C.    On or about July 2, 2002, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $137,667 check from the Atlanta schools to be deposited into the NCPEp-AB&T account.

D.    On or about July 2, 2002, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $18,000 check from the Buffalo schools to be deposited into the NCPEp-AB&T account.

E.    On or about September 19, 2002, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $125,000 check from the Santa Monica schools to be deposited into the NCPEp-AB&T account.

F.    On or about March 25, 2003, Robert Felner and **THOMAS SCHROEDER** fraudulently caused two checks, one for $105,000 and one for $20,000, from the Santa Monica schools to be deposited into the NCPEp-Citizens account.

G.    On or about June 24, 2003, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $44,000 check from the Buffalo schools to be deposited into the NCPEp-Citizens account.

H.    On or about June 18 2004, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $49,500 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

15

I. On or about August 31, 2004, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $189,000 check from the Atlanta schools to be deposited into the NCPEp-BB&T Business account.

J. On or about December 20, 2004, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $125,000 check from the Santa Monica schools to be deposited into the NCPEp-BB&T Business account.

K. On or about February 14, 2005, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $33,000 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

L. On or about March 2, 2005, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $22,000 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

M. On or about April 22, 2005, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $27,500 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

N. On or about June 2, 2006, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $24,750 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

O. On or about June 12, 2006, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $16,500 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

P.     On or about June 22, 2006, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $24,750 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

Q.     On or about April 7, 2007, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $200,000 check from the UofL to be deposited into the NCPEp-BB&T Business account.

R.     On or about July 28, 2007, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $50,000 check from the UofL to be deposited into the NCPEp-BB&T Business account. This check was in payment of a June 29, 2007, NCPEp invoice for work claimed completed under the January 5, 2007, personal service contract between UofL and NCPEp.

S.     On or about August 9, 2007, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $44,000 check from the Buffalo schools to be deposited into the NCPEp-BB&T Business account.

T.     On or about September 24, 2007, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $22,000 check from the Buffalo schools to deposited into the NCPEp-BB&T Business account.

U.     On or about December 31, 2007, Robert Felner and **THOMAS SCHROEDER** fraudulently caused a $200,000 check from the UofL to be deposited into the NCPEp-BB&T Business account. This check was in payment of a November 30, 2007, NCPEp invoice for work claimed completed under the December 3, 2007, subcontract between UofL and NCPEp.

17

V.     From in or about 2001 through 2008, **THOMAS SCHROEDER**
made and caused to be made approximately $296,935.68 in payments to be made
to himself or for his personal benefit from the NCPEp-AB&T account in the
following amounts:

    (1)    2001: $28,144.40
    (2)    2002: $73,351.44
    (3)    2003: $82,382.64
    (4)    2004: $37,220.78
    (5)    2005: $20,452.85
    (6)    2006: $18,622.92
    (7)    2007: $30,029.39
    (8)    2008: $6,731.56

W.     From in or about 2001 through 2003, Robert Felner made and
caused to be made approximately $365,807 in payments to be made to himself or
for his personal benefit from the NCPEp-AB&T account in the following
amounts:

    (1)    2001: $199,000
    (2)    2002: $141,807
    (3)    2003: $25,000

X.     From in or about 2002 through 2004, Robert Felner made and
caused to be made approximately $904,770 in payments to be made to himself or
for his personal benefit from the NCPEp-Citizens account in the following
amounts:

    (1)    2002: $385,965
    (2)    2003: $344,528
    (3)    2004: $174,277

Y.     From in or about 2004 through 2008, Robert Felner made and caused to be made approximately $1,264,000 in payments to be made to himself or for his personal benefit from the NCPEp-BB&T Business account in the following amounts:

    (1)    2004: $355,642
    (2)    2005: $253,058
    (3)    2006: $94,396
    (4)    2007: $351,021
    (5)    2008: $209,883

Z.     From in or about June 2004 through July 2008, **THOMAS SCHROEDER** fraudulently caused RICCA to make $88,750 in payments to Felner and NCPEp for work he fraudulently represented to RICCA was performed by Robert Felner and NCPEp pursuant to a contract with RICCA. **THOMAS SCHROEDER** then deposited these checks into the NCPEp-AB&T account.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(ii) and 1956(h).

The Grand Jury further charges:

## COUNT 3
### (Conspiracy to Impede and Impair the IRS)

34.     The Grand Jury realleges and incorporates by reference paragraphs 2 through 33 as through fully set forth herein.

35.     From in or about July 2001 through July 2008, in the Western District of Kentucky, Jefferson County, Kentucky, and elsewhere, the defendant **THOMAS SCHROEDER** and Robert Felner did knowingly combine, conspire, confederate, and agree with one another, to

19

defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service ("IRS") in the ascertainment, computation, assessment and collection of federal income taxes owed by **THOMAS SCHROEDER** and Robert Felner.

THE OBJECT OF THE CONSPIRACY

36.     It was an object of the conspiracy that Robert Felner and **THOMAS SCHROEDER** agreed to conceal through NCPEp income from the Internal Revenue Service.

MANNER AND MEANS OF THE CONSPIRACY

37.     It was part of the conspiracy that Robert Felner and **THOMAS SCHROEDER** received substantial amounts of income and then attempted to conceal this income from the Internal Revenue Service by depositing the income into NCPEp bank accounts.

OVERT ACTS

38.     In furtherance of the conspiracy and in order to accomplish its objectives within the Western District of Kentucky and elsewhere, Robert Felner and **THOMAS SCHROEDER** committed and caused to be committed overt acts, including the following:

A.      On or about June 5, 2001, **THOMAS SCHROEDER** applied for an EIN on behalf of NCPEp. He listed NCPEp as a Charitable Organization on the application.

B.      In or about May 2001, **THOMAS SCHROEDER** set up an undated Executive Consulting Agreement with NCPEp to pay himself $3,000 a month for the period May 1, 2001, through April 30, 2002.

C.   On or about July 17, 2001, the NCPEp bank account was established with a $404,000 deposit from the Atlanta schools. **THOMAS SCHROEDER** and T.F. were the signatories on the account.

D.   On or about July 24, 2001, **THOMAS SCHROEDER**, as NCPEp's executive director, signed a Royalty Agreement with Robert Felner for $97,000.

E.   On July 24, 2001, Robert Felner invoiced NCPEp $78,000 for consultation and training.

F.   On July 26, 2001, Robert Felner and **THOMAS SCHROEDER** caused $175,000 to be wired from the NCPEp-AB&T to Robert Felner's personal bank account at Fleet Bank.

G.   On or about September 7, 2001, R.S. signed a waiver of notice as Secretary of NCPEP stating that the Board of Directors held a meeting and approved the Consulting Agreement for **THOMAS SCHROEDER**, the Royalty Agreement for Robert Felner, the $78,000 invoice by Robert Felner.

H.   On October 17, 2001, NCPEp, through its registered agent, filed Illinois Articles of Incorporation. T.F., J.T., and R.S. are listed as Directors. **THOMAS SCHROEDER** signs as Incorporator of this "General Not-For-Profit" corporation.

I.   In early 2002 NCPEp issued a Form 1099 to Robert Felner for $97,000 in Royalties and $105,000 in non-employee compensation.

J.   On April 12, 2002, the NCPEp-Citizens account was opened with a NCPEp check for $250,000 signed by T.F. and **THOMAS SCHROEDER.**

K.      On September 19, 2002, $125,000 was wire transferred from the NCPEp-AB&T account to the NCPEp-Citizens accounts.

L.      In early 2008 **THOMAS SCHROEDER** fraudulently provided Robert Felner with a NCPEp 2007 Form 1099 stating that Robert Felner earned $36,450 from NCPEp in 2007.

M.      From in or about 2001 through 2008, Robert Felner and **THOMAS SCHROEDER** made and caused to be made approximately $296,935.68 in payments to be made to **THOMAS SCHROEDER** or for his personal benefit from the NCPEp-AB&T account.

N.      From in or about 2001 through 2003, Robert Felner and **THOMAS SCHROEDER** made and caused to be made approximately $365,807 in payments to be made to Robert Felner or for his personal benefit from the NCPEp-AB&T account.

O.      From in or about 2002 through 2004, Robert Felner and **THOMAS SCHROEDER** made and caused to be made approximately $904,770 in payments to be made to Robert Felner or for his personal benefit from the NCPEp-Citizens account.

P.      From in or about 2004 through 2008, Robert Felner and **THOMAS SCHROEDER** made and caused to be made approximately $1,264,000 in payments to be made to Robert Felner or for his personal benefit from the NCPEp-BB&T Business account.

Q. From July 2001 through July 2008, Robert Felner and **THOMAS SCHROEDER** used the NCPEp bank accounts for their personal benefit use and not for any business or charitable purpose of NCPEp.

R. On or about November 17, 2003, **THOMAS SCHROEDER** filed a 2002 Form 1040. On the attached Schedule C he reported $60,000 in NCPEp gross income. He actually received $73,351, and, therefore, failed to report approximately $13,351 in gross income received from NCPEp.

S. On or about November 20, 2004, **THOMAS SCHROEDER** filed a 2003 Form 1040. On the attached Schedule C he reported $65,000 in NCPEp gross income. He actually received $82,382, and, therefore, failed to report approximately $17,382 in gross income received from NCPEp.

T. On or about November 14, 2005, **THOMAS SCHROEDER** filed a 2004 Form 1040. On the attached Schedule C he reported $26,350 in NCPEp gross income. He actually received $37,220, and, therefore, failed to report approximately $10,870 in gross income received from NCPEp.

U. On or about November 18, 2006, **THOMAS SCHROEDER** filed a 2005 Form 1040. On the attached Schedule C he reported $12,000 in NCPEp gross income. He actually received $20,452, and, therefore, failed to report approximately $8,452 in gross income received from NCPEp.

V. On or about October 15, 2007, **THOMAS SCHROEDER** filed a 2006 Form 1040. On the attached Schedule C he reported $12,000 in NCPEp

gross income. He actually received $18,622, and, therefore, failed to report approximately $6,622 in gross income received from NCPEp.

All in violation of Title 18, United States Code, Section 371.


<u>NOTICE OF FORFEITURE</u>

As a result of committing offenses in violation of Title 18, United States Code, Sections 1341, 1956 and 1957, as alleged in Counts 1 through 2 of this Indictment, the defendant, **THOMAS SCHROEDER** and Robert Felner, shall forfeit to the United States pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461, any and all property constituting, or derived from, proceeds defendants obtained, directly or indirectly, as a result of these offenses, and any and all property involved in (or traceable thereto) the money laundering offense alleged in Count 2 of this Indictment. The property subject to forfeiture includes but is not limited to the following:

A.     <u>PERSONAL PROPERTY</u>

   a.     Contents of Account No. xxxxxxxxx4646 (including any other investment accounts associated with this account, including but not limited to xxxxx2658), in the name of the National Center for Public Education and Prevention, Inc..

   b.     Contents of Account No. xxxxxxxxx0474, in the names of Robert D. Felner and Marilyn E. Felner.

B.     <u>REAL PROPERTY</u>

   1.     Real property located at or near 3024 Sloop Lane, St. James City, Lee County, Florida, including all buildings and improvements thereon and appurtenances

thereto, more particularly described (in Book Number 4539, Page Number 1038) as

follows:

> Lot 713, Island VII, Cherry Estates, Section 1 thru 9, according to
> the map or plat thereof on file and recorded in the Office of the
> Clerk of the Circuit Court in Plat Book 29, Pages 54 to 64, Public
> Records of Lee County, Florida.

2.     Real property located at or near 4 Eagle Pointe Circle, Rapids City, County

of Rock Island, Illinois, including all buildings and improvements thereon and

appurtenances thereto, more particularly described (in Book Number 2005, Page Number

06266) as follows:

> Lot 14 in Eagle Pointe 2nd Addition in the Village of Rapids City,
> Illinois; situated in the County of Rock Island, State of Illinois.

C.     MONEY JUDGMENT

A sum of money including but not limited to approximately two million one

hundred thousand dollars ($2,100,000.00), representing the amount of proceeds obtained

as a result of the offenses alleged in Counts 1 through 2 of this Indictment.

D.     SUBSTITUTE ASSETS

If any of the above-described forfeitable property, as a result of any act or omission

of the defendant, **THOMAS SCHROEDER** and Robert Felner,

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third party;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be divided without

difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other

property of the defendant up to the value of the above-described forfeitable property.

All in accordance with Title 18, United States Code, Sections 981 and 982, and Title 28

United States Code, Section 2461.

A TRUE BILL

CANDACE G. HILL
UNITED STATES ATTORNEY

CGH:BRC:vlp:100113

**VERDICT FORM**

| 𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 𝔻𝕚𝕤𝕥𝕣𝕚𝕔𝕥 ℂ𝕠𝕦𝕣𝕥 | **District**<br><br>Western District of Kentucky |
|---|---|
| **Case Title**<br><br>UNITED STATES OF AMERICA<br><br>v.<br><br>THOMAS SCHROEDER | **Docket No.**<br><br><br>CRIMINAL ACTION NO. 3:08CR-119-S |

**WE, THE JURY, IN THE ABOVE ENTITLED AND NUMBERED CASE FIND:**

The defendant, Thomas Schroeder, _____ as to Count 1 of the superseding indictment.
guilty/not guilty

The defendant, Thomas Schroeder, _____ as to Count 2 of the superseding indictment.
guilty/not guilty

The defendant, Thomas Schroeder, _____ as to Count 3 of the superseding indictment.
guilty/not guilty

| **Foreperson's Signature** | **Date** |
|---|---|
| | |